Marcela JOHNSTON *v.* ARKANSAS DEPARTMENT OF
HUMAN SERVICES

CA 95-1211                               935 S.W.2d 589

Court of Appeals of Arkansas
En Banc
Opinion delivered December 23, 1996

*Mary J. Pruniski,* for appellant.

*David K. Overton,* Office of Chief Counsel, for appellee Department of Human Services.

*Kathleen Bailey O'Connor,* guardian *ad litem,* for the juvenile.

JOHN F. STROUD, JR., Judge. Marcela Johnston appeals from an order of the juvenile court which determined that her daughter, Blair, was dependent-neglected and placed Blair in a foster home, with appellee Department of Human Services maintaining legal custody. We affirm.

Blair Johnston was born on November 23, 1994. On April 10, 1995, when she was approximately four and one-half months old, the Arkansas Department of Human Services received a complaint concerning Blair, alleging child neglect. A seventy-two hour protective hold was placed on Blair. On April 18, 1995, DHS filed a petition for emergency custody. On the same day, an ex-parte order for emergency custody was entered by the Juvenile Division of the Pulaski County Chancery Court, and Blair was placed in DHS custody. On April 24, 1995, the probable cause hearing was held. The court determined there was probable cause to believe that the emergency conditions which necessitated Blair's removal continued. Blair remained in DHS custody pending the adjudication hearing. The adjudication hearing began on May 16, 1995, and was continued on June 22, 1995. The adjudication order was entered on July 26, 1995, finding that Blair was dependent-neglected; that it would not be in her best interest to return to appellant's custody; and that it was in Blair's best interest to continue in foster care with legal custody remaining in DHS.

Appellant raises two points of appeal, both of which have several subpoints. The two major points can be summarized as follows: (1) the trial court erred at the probable cause hearing in finding that probable cause existed for continuation of the emergency order; and (2) the trial court erred at the adjudication hearing in finding that Blair was dependent-neglected. The second point

controls the outcome of this appeal, and we find no clear error in the chancellor's decision.

■ We do not decide the first issue since it is not necessary to the outcome of this appeal. However, we note our serious reservations concerning the amount of evidence left to establish probable cause after the allegations in the affidavit supporting the petition for emergency custody were explored at the probable-cause hearing. Since probable-cause-hearing orders are not final and appealable, the statutory scheme of the juvenile code adds the safeguard of requiring that an adjudication hearing be held within thirty days of the probable cause hearing. In that way, any errors made in the probable cause hearing, which would not be subject to immediate appeal, are minimized by requiring the full adjudication hearing to follow soon thereafter.

Although appellant subdivides her second point of appeal into several subpoints, the root of her argument is that the trial court's finding that Blair was dependent-neglected is clearly against the preponderance of the evidence. We find that the trial court's decision was not clearly erroneous.

At the adjudication hearing, the chancellor heard the testimony of Rickie Lockwood, a clinical therapist for the Little Rock Community Mental Health Center. Ms. Lockwood held a bachelor's degree in sociology and a master's degree in clinical social work, which she received in 1993. However, she had worked professionally in the field of abuse and neglect for eighteen years.

Appellant had a history of psychological difficulties and had been diagnosed as having bipolar disorder, for which lithium is a prescribed medical treatment. Appellant was hospitalized for the condition in June 1994, at which time her mother and brother obtained custody of her other daughter, Randal. When she was released from the hospital, appellant was treated at the Little Rock Community Health Center. Ms. Lockwood began seeing appellant in September 1994 after appellant expressed a desire to have Ms. Lockwood as her primary therapist, rather than the therapist she had been seeing. Ms. Lockwood continued seeing appellant for weekly sessions through January 20, 1995, a period of approximately five months.

For the majority of this five-month period, appellant was pregnant with Blair and therefore unable to take lithium. Blair was

born on November 23, 1994. Appellant's symptoms increased after Blair's birth. She began taking lithium around the first of December 1994, but it takes time for the medication to become regulated and begin working. She was hospitalized from December 12, 1994, to December 21, 1994. Ms. Lockwood last saw appellant on January 20, 1995. Appellant changed doctors and began seeing Dr. Brad Diner in January 1995. He was her treating psychiatrist at the time of the probable-cause hearing and the adjudication hearing.

Ms. Lockwood testified that appellant was very impulsive; that she externalized blame and responsibility for everything that happened; that she exercised poor judgment; that she acted in an adolescent manner; and that she had a history of objectifying or seeing her children as objects rather than as human beings with needs. She also testified that appellant had a history of stopping medication against doctors' recommendations. She stated that she does not think appellant is capable of nurturing Blair emotionally; and that appellant is not capable of caring, understanding, and opening up. She stated that her concern really deepened when appellant commented to her that she had sometimes put Randal, appellant's other daughter, in a room with a baby gate and allowed her to cry herself to sleep or tear up the room. Ms. Lockwood stated that in her opinion appellant's parenting abilities are very limited and that Blair would be at risk in appellant's home.

The other testimony presented at the adjudication hearing was either generally favorable or neutral with respect to appellant's ability to care for Blair. For example, Blair's pediatrician, Dr. Anthony Johnson, testified that he saw Blair when she was two weeks old, ten weeks old, three-and-one-half months old, and four-and-one-half months old; that she was clothed appropriately, clean, developing perfectly; that appellant acted appropriately with Blair during these visits and appeared to be bonded with Blair; that he had seen nothing to make him think there was a problem; and that he has a number of patients who have bipolar disorder and properly care for their children.

Sue Wilson is the DHS caseworker who supervised appellant's visits with Blair during the one-month period between the time Blair was removed from appellant's custody and the adjudication hearing. She testified that there had been at least four or five visits of about two hours each, and that appellant's actions with Blair were very appropriate.

Judy Sanders is the director of the preschool Blair attended prior to her removal to DHS custody. Ms. Sanders testified that she had observed appellant with Blair from January 1995 until April 1995, and that appellant interacted well with Blair and met her physical needs.

Gloria Beard kept Blair in the baby room at the preschool. She saw appellant with Blair on a daily basis. She felt Blair was doing fine and saw no problems.

Nancy Brinkley had known appellant for about one year after working with her at the same place of employment. She testified that appellant interacted appropriately with other persons in the office. She also said that she had seen appellant with Blair on a couple of occasions, and that she interacted really well with Blair.

Reba Gaines was an intake supervisor with the DHS Division of Children and Family Services. She supervised Michael King, the family services worker who investigated the report of child maltreatment concerning appellant which was conducted prior to the probably cause hearing. She testified that King called her from appellant's home and told her he saw no reason to place Blair into custody that day; that she was a happy, healthy baby; and that he felt the situation was good. She said DHS decided to remove Blair based on information received from Rickie Lockwood.

Appellant testified about her medical history, her current treatment and therapy with Dr. Diner, and the allegations contained in the petition that resulted in Blair's removal from appellant's custody.

Dr. Brad Diner testified that he had seen appellant five times since January 1995, approximately thirty minutes each visit, and that he had talked with her by telephone on numerous occasions. However, he had not seen appellant and Blair together. He said that bipolar was still his working diagnosis for appellant; that her lithium levels were in the therapeutic range; that he was comfortable with the fact she was adhering to the minimum requirements necessary to keep her stable; that he had never seen anything to suggest that appellant would harm her children; that he knew of no reason from a mental health standpoint why Blair should not be returned to appellant. He acknowledged appellant's extensive medical history, and acknowledged that there was some confusion among other treating physicians about whether her diagnosis was schizophrenia or bipolar disorder. He agreed that there was a point at which she

had been seriously disturbed, but she was not now; that there are "tons" of people with mental diseases that do not make them unfit parents; that he had no current concerns about appellant complying with her treatment; and that he would have no problem providing the court with periodic reports.

Furthermore, as part of the adjudication hearings, the chancellor ordered appellant to submit to "a parenting assessment designed to formulate a plan to correct any deficiencies." A letter from Larry Clarke, the psychologist who assessed appellant, was introduced at the adjudication hearing. The letter stated that he met with appellant on June 12, 1995, for more than four hours, and that she related her life history, her experiences in her family of origin, her educational background, her marriage and divorce, her decision to have children (Randal, age 7, and Blair, 6 months) by artificial insemination, her treatment with lithium for depression/bipolar disorder, and events surrounding her daughter's being taken from her custody. He was also able to meet with appellant and Blair on June 13, 1995, for approximately thirty minutes during their weekly visit at the DHS offices. He concluded in pertinent part:

> Dr. Johnston's [appellant's] behavior with Blair was entirely appropriate. She brought with her to the visit a number of objects suitable for play with a baby of Blair's age and proceeded to employ them skillfully to keep Blair amused.

> Blair's responses to her mother were positive and as expected for an infant of 6-7 months.

> My assessment of Dr. Johnston [appellant] detected no reason why she should not be currently capable of caring for her daughter. My own inclination would be to return Blair to her unless there were some substantial evidence she had regularly behaved in ways which placed this child at risk.

> The view that her current psychological functioning is adequate to permit good parenting was further supported by the Personality Assessment Inventory which Dr. Johnston [appellant] completed at the time of her evaluation.

> . . .

> She is a highly educated person who reports that she has a Masters degree in counseling from N.Y.U. and a Ph.D. in psychology from Hofstra.

. . .

> Dr. Johnston [appellant] has been diagnosed with a bipolar disorder.... Although this is a relatively serious psychiatric diagnosis, it is also one which can often be very well controlled through medication.

. . .

> Although Dr. Johnston [appellant] is currently functioning well it is not possible to say how her condition might change if she were to discontinue medication without consulting her physician. For this reason, I have strongly recommended that she make no change in medication without consulting Dr. Diner.

> Dr. Johnston [appellant] has indicated that she plans to continue her work with Dr. Diner and would not change her medication unilaterally. Dr. Diner can indicate for the court whether Dr. Johnston [appellant] has been compliant with treatment to date.

■ The juvenile code requires proof by a preponderance of the evidence in dependency–neglect proceedings. Ark. Code Ann §§ 9-27-325(h)(2)(B) (Supp. 1995). We review a chancellor's findings of fact de novo, and will not set them aside unless they are clearly erroneous, giving due regard to the trial court's opportunity to judge the credibility of the witnesses. Ark. R. Civ. P. 52(a). A finding is clearly erroneous when, although there is evidence to support the finding, after reviewing all of the evidence the reviewing court is left with the definite and firm conviction that a mistake has been made. *Nichols* v. *Wray*, 325 Ark. 326, 925 S.W.2d 785 (1996).

■ A dependent-neglected child is one who "as a result of abandonment, abuse, sexual abuse, sexual exploitation, neglect, or parental unfitness is at substantial risk of serious harm." Ark. Code Ann. § 9-27-303(12) (Supp. 1995). The juvenile code further defines "neglect" as an act or omission by a parent which constitutes the "[f]ailure or irremedial inability to provide for the essential and necessary physical, mental, or emotional needs of the juvenile." Ark. Code Ann. § 9-27-303(23)(D) (Supp. 1995).

■ At the adjudication hearing, the chancery court was presented with conflicting testimony concerning appellant's ability

to provide for the essential and necessary physical, mental, or emotional needs of Blair, an infant totally dependent upon her care giver. Therefore, we cannot say that the chancellor's choice of crediting Ms. Lockwood's testimony over that of the other witnesses was clearly erroneous.

Affirmed.

JENNINGS, C.J., and PITTMAN, ROBBINS, and ROGERS, JJ., agree.

MAYFIELD, J., dissents.

MELVIN MAYFIELD, Judge, dissenting. I cannot agree to affirm this case because I think the order appealed from may be moot. The order was entered July 26, 1995, and the final paragraph states: "Jurisdiction is continued with review hearing set for September 25, 1995 at 1:30 p.m." The order also states that "the goal of this case shall be reunification and the case plan developed by DHS is approved."

Thus, here we are in December of 1996 affirming an order which, from its last paragraph, we know may now be moot.

In *Gullick* v. *Arkansas Dept. of Human Services* 326 Ark. 475, 931 S.W.2d 786 (1996), a case somewhat like this one, the dissenting opinion raises the question of whether the order appealed from is a final order.

We can wait for legislative action as suggested in *Gullick* or can do something now. I would issue a writ of certiorari for the trial court to send to this court any order entered in this case since July 26, 1995. I would then, depending on what has happened since, decide what to do about this case.

I dissent from the affirmance of this case.